## Case No. 302a.

### AMERICAN INS. CO. et al. v. CANTER.

[1 Pet. (26 U. S.) 516, note.]

Circuit Court, D. South Carolina.

TREATIES—CEDED TERRITORY — LEGAL STATUS OF FLORIDA —FEDERAL AND TERRITORIAL COURTS— CONFLICTING JURISDICTION.

[1. The right of the United States to acquire territory by cession from a foreign sovereignty is incidental to the treaty-making power, and the government of such acquisition is left to the legislative power of the Union so far as that power is controlled by treaty; but the government and laws of the United States do not extend to such territory by the mere act of cession, for the laws, rights, and institutions of the territory so acquired remain in full force until rightfully altered by the new government.]
[See note at end of case.]

[2. Act May 26. 1824, (4 Stat. 45.) providing that each of the superior courts of the territory of Florida shall have the same jurisdiction within its limits, "in all cases arising under the laws and constitution of the United States," which by the act of September 24. 1789, § 10, (1 Stat. 77,) was vested in the court of the district of Kentucky, restricts the jurisdiction of the superior courts to "cases arising under the laws and constitution of the United States." and does not include causes for salvage arising on wreck of the sea, which are left to be administered under the laws of the territory.]
[See note at end of case.]

[3. Act March 30, 1822, § 5, (3 Stat. 655,) establishing a territorial government for Florida, with a legislative council, with "power to alter, modify, or repeal the laws which may be in force at the commencement of this act," provided that "the legislative powers shall extend to all rightful subjects of legislation, but no law shall be valid which is inconsistent with the constitution and laws of the United States." Held, that jurisdiction of salvage cases was a

rightful subject of legislation, and that the territorial legislature had the right to create a municipal court with jurisdiction of such cases.]

[See American Ins. Co. v. Johnson, Case No. 303, note.]

[See note at end of case.]

[4. An action to set aside a sale of wrecked property, directed by a territorial court of Florida to satisfy demand for salvage, on the ground that the court was without jurisdiction, is not a case "arising under the laws of the United States," although the validity of the sale depends on the legality of powers exercised by the territorial court, which depends on powers vested in the territorial legislature, which finally depends on acts of congress. Osborn v. Bank of U. S., 9 Wheat. (22 U. S.) 738, not followed.]

[5. The judicial acts of the United States did not become laws in the territory of Florida under the act of March 30, 1822, § 9, (3 Stat. 656,) making in force within the territory all public laws of the United States not repugnant to the provisions of the act, as no circuit and district courts of the United States had been organized in the territory.]

[See American Ins. Co. v. Johnson, Case No. 303, note.]

[See note at end of case.]

[6. Under the act of March 30, 1822, § 5, (3 Stat. 655,) reserving to congress the right to repeal acts of the territorial legislature of Florida, territorial enactments did not require the ratification of congress to render them valid.]

[See note at end of case.]

[7. Act May 26, 1824, § 1, (4 Stat. 45,) gives original jurisdiction to the superior courts of the territory of Florida in all cases of $100 in value: and Act March 30, 1822, §§ 6, 7, (3 Stat. 656,) provide "that the judiciary power shall be vested in two superior courts, and in such inferior court and justices of the peace as the legislative council of the territory may from time to time establish," and confine the superior courts exclusively to jurisdiction over the cases arising under the laws and constitution of the United States of which the Kentucky district court had jurisdiction. *Held*, that the act of the legislative council erecting a territorial court with jurisdiction of salvage cases was valid, as such council was not precluded by statute from making any distribution of jurisdiction consistent with preserving to the superior court a concurrent jurisdiction.]

[See American Ins. Co. v. Johnson, Case No. 303, note.]

[See note at end of case.]

[Appeal from the district court for the district of South Carolina.

[In admiralty. Libel by the American Insurance Company and the Ocean Insurance Company to set aside a judicial sale of 356 bales of cotton, (David Canter, claimant.) From a decree setting aside the sale, and directing the restitution to libelants of a part of the cotton, both libelants and claimant appeal. Reversed. Decree of reversal subsequently affirmed on appeal to the supreme court. 1 Pet. (26 U. S.) 511.]

H. N. Cruger, for libelants.
King & Gadsden, for claimant.

JOHNSON, Circuit Justice. This case comes up on a cross appeal, from a decision of the district court, adjudging a part of the res subjecta to the libelants, and the residue to the claimants. The decree establishes the right of the parties libelant to recover, but dismisses the libel as to a great proportion of the cotton, on the ground of a defect of evidence to identify it. From the pleadings and testimony, it appears that the libelants were insurers to a large amount on a quantity of cotton shipped by certain individuals, in the French ship Point a Petre, on a voyage from Orleans to Havre; that the ship was stranded and lost on the coast of Florida, and the cotton abandoned to these underwriters. That the cotton libeled was a part of the cargo of the Point a Petre is admitted; but it appears, that after being saved from the wreck, it was deposited at Key West, where it was sold and purchased by Canter, the claimant, under the order of a municipal court, constituted under a law of Florida, with jurisdiction over cases of salvage.

The preliminary question alone has now been argued, to wit, whether the sale by that court was effectual to divest the interest of the underwriters. The general principle is not denied as to the mutations of property which takes place through the intervention of courts of justice; but it was argued that the constitution of the United States vests the admiralty jurisdiction exclusively in the general government. That no state can exercise a concurrent jurisdiction over admiralty and maritime causes, and that salvage was of that description. Wherefore the legislature of Florida had, in organizing this court, exercised a power not legally vested in it, and the act constituting it being a void act, it was as though no such court existed. That moreover, the nullity of that court did not rest merely on an inherent want of power to constitute it, but on positive prohibition contained in the acts organizing the government of the territory to pass any laws contrary to the laws and constitution of the United States. That the act organizing this court was an act of this nature, inasmuch as jurisdiction of causes, admiralty and maritime, were expressly vested in the superior courts of Florida; and that, without the right of exercising a concurrent power over the subject vesting this jurisdiction in an inferior court, is quoad hoc, devesting the superior court of its jurisdiction, and rendering null the act of congress, which vests the admiralty jurisdiction in that alone. On the other hand, it has been contended. that salvage is a subject of municipal and common law cognizance, not exclusively belonging to the admiralty; that although the constitution may vest the exclusive cognizance of admiralty and maritime causes in the United States, in those instances in which the admiralty at the adoption of the constitution had exclusive jurisdiction of the subject, yet, in those cases in which the common law exercised a concurrent jurisdiction with the admiralty, there is no reason for carrying the grant beyond a concurrent jurisdiction with the common law courts of the states. That

the court which ordered this sale was properly a municipal court, and a court of a separate and distinct jurisdiction from the courts of the United States, and as such its acts are not to be reviewed in a foreign tribunal; of which description, it was contended, were the courts of the United States for South Carolina district. That the district of Florida was no part of the United States, but only an acquisition or dependency, and as such the constitution, per se, had no binding effect in or over it. And, finally, that argument drawn from the assumed fact that the admiralty and maritime jurisdiction was by law expressly vested in another court, originates in a misconstruction of the law, inasmuch as no act of congress vests in the superior court any other portion of the jurisdiction of the Kentucky court than that of causes arising under the laws of the United States. That this is not a cause of that description; it is one arising under a casualty in which no law of the United States came necessarily under review. To this it was replied that it was a cause arising under a law of the United States, and the case of Osborn v. Bank of U. S. [9 Wheat. (22 U. S.) 738] was quoted and insisted on as furnishing a decision in point. That if the cause there was one of that description, because the bank was incorporated by a law of the United States, for the same reason was this a cause of that description, because the body politic here was like the body corporate there, created by a law of the United States; and, if at every step there the court was met by the law which made the one a bank, gave it power to make by-laws, and to act under those by-laws, so was it equally met here by the laws which made this a state. gave it power to legislate, and legalized this transfer of property under laws which, without the laws of the United States, were mere nullities.

It becomes indispensable to the solution of these difficulties that we should conceive a just idea of the relation in which Florida stands to the United States, and give a correct construction to the second section of the act of congress of May the 26th, 1824, [4 Stat. 45,] respecting the territorial government of Florida; correct views on these two subjects will dispose of all the points that have been considered in argument. And first, it is obvious that there is a material distinction between the territory now under consideration and that which is acquired from the aborigines, (whether by purchase or conquest,) within the acknowledged limits of the United States, as also that which is acquired by the establishment of a disputed line. As to both these there can be no question that the sovereignty of the state or territory within which it lies, and of the United States, immediately attach, producing a complete subjection to all the laws and institutions of the two governments, local and general, unless

modified by treaty. The question now to be considered relates to territories previously subject to the acknowledged jurisdiction of another sovereign; such as was Florida to the crown of Spain. And on this subject we have the most explicit proof that the understanding of our public functionaries is, that the government and laws of the United States do not extend to such territory by the mere act of cession. For, in the act of congress of March the 30th, 1822, section 9, [3 Stat. 659,] we have an enumeration of the acts of congress, which are to be held in force in the territory; and, in the 10th section, an enumeration, in nature of a bill of rights, or privileges, and immunities which could not be denied to the inhabitants of the territory if they came under the constitution by the mere act of cession. As, however, the opinion of our public functionaries is not conclusive, we will review the provisions of the constitution on this subject.

At the time the constitution was formed, the limits of the territory over which it was to operate were generally defined and recognized. These limits consisted in part of organized states, and in part of territories, the absolute property and dependencies of the United States. These states, this territory, and future states to be admitted into the Union, are the sole objects of the constitution; there is no express provision whatever made in the constitution for the acquisition or government of territories beyond those limits. The right, therefore, of acquiring territory is altogether incidental to the treaty-making power, and perhaps to the power of admitting new states into the Union; and the government of such acquisitions is, of course, left to the legislative power of the Union, as far as that power is controlled by treaty. By the latter we acquire either positively or sub modo, and by the former dispose of acquisitions so made; and in case of such acquisitions I see nothing in which the power acquired over the ceded territories can vary from the power acquired under the law of nations by any other government over acquired or ceded territory. The laws, rights, and institutions of the territory so acquired remain in full force until rightfully altered by the new government. In the present instance, however, the laws of Florida were not left to derive their force from general principles alone; for by the 13th section of the same act it is declared, "that the laws in force in the said territory at the commencement of this act, and not inconsistent with the provisions thereof, shall continue in force until altered, modified, or repealed by the legislature. From these views of the subject it results, 1st. That, whatever may be the correct idea of the distribution of the admiralty jurisdictions as between the states and the United States, it can have no application here, since this territory does not stand in the relation of a state to the United

States. 2nd. That, whether salvage be of admiralty jurisdiction exclusively or not, it is immaterial to this cause, since the whole power of legislation over the subject in Florida existed exclusively in the general government. 3rd. That the general principles of international law on the immunities of foreign courts and foreign decisions have no application here, since the courts of Florida have a common origin with this court. Our authority flows from the same source. We are connected at the fountain-head, governed by the same legislative power, and have equal access to the laws which constitute and govern us. It follows that neither can regard the decisions of the other, if acting without authority derived through the legislature of the Union. The act entitled "An act for the establishment of a territorial government in Florida," [Act of March 30, 1822; 3 Stat. 654,] and the acts in pari materia of the 3d March, 1823, [3 Stat. 750,] and the 26th May, 1824, [4 Stat. 45,] constitute what may be properly termed the constitution of Florida. The first provides for the appointment of an executive, with powers not material here to be considered. It constitutes a legislature, organizes a judiciary, and imposes upon the one and the other some general restrictions, subject to which they are empowered to exercise the legislative, judicial, and executive powers which belong generally to an organized government. The act of March, 1823, goes over the same ground, and repeals the preceding act so far as the provisions of the latter are inconsistent with those of the former act. And with regard to both, or either, as far as the latter remains unrepealed, the position is incontrovertible that the legislative power could enact nothing inconsistent with what congress has made inherent and permanent in the form of government of the territory. Therefore, if the admiralty jurisdiction is made inherent in the superior courts, it was not in the power of the territorial legislature to transfer it to any inferior tribunal. To determine this question we must examine the provisions of the several acts touching the exercise of legislative and judicial power.

In defining the legislative power, the words of the act of 1822 are these: "They shall have power to alter, modify or repeal the laws which may be in force at the commencement of this act. These legislative powers shall, also, extend to all the rightful subjects of legislation; but no law shall be valid which is inconsistent with the constitution and laws of the United States, or which lay any person under restraint, burthen or disability, on account of his religious opinions, professions or worship; in all which he shall be free to maintain his own, and not to be burthened with those of another." The language of the act of 1823 [3 Stat. 751, § 5] is: "They shall have legislative power over all rightful subjects of legislation; but no law shall be valid which is inconsistent with the

constitution and laws of the United States; or which lay any person under restraint," &c.

That jurisdiction of salvage is a rightful subject of legislation is not to be questioned. The jurisdiction, then, vested by the legislature in this municipal court, must be sustained, unless inconsistent with the laws or constitution of the United States. But with the constitution, in legislating on the subject of salvage, there can be no incongruity; it is only, therefore, the supposed inconsistency with the act of congress of May, 1824, that can impugn it. The provisions of that act upon this subject are these: "Each of the said courts (meaning the superior courts of the district of Florida) shall moreover have and exercise the same jurisdiction within its limits, in all cases arising under the laws and constitution of the United States, which, by an act to establish the judicial courts of the United States, approved the 24th day of September, 1789, [1 Stat. 73,] and 'an act in addition to the act, entitled an act to establish the judicial courts of the United States, approved the 2nd of March, 1793,' [1 Stat. 33, c. 22,] was vested in the court of Kentucky district." The question, then, is reduced to this, in what cases arising under the laws and constitution of the United States is jurisdiction vested in the court of Kentucky district by the two acts of the 24th September, 1789, and the 2d March, 1793? It has been erroneously assumed, that all the jurisdiction vested by those acts in the Kentucky court, was vested by this law in the superior court of Florida; it is expressly confined to cases arising under the laws and constitution of the United States; and the reason is obvious. In all cases arising under the laws of the district, jurisdiction is given by the preceding section of the same act; but, as most of the laws of the United States had been made of force in the territory as before observed, the 2d section is intended to extend the jurisdiction of the court to cases arising under the latter laws, and further, if necessary, to all cases arising under laws of the United States, over which jurisdiction had been given to the Kentucky court,— a practice in defining jurisdiction that had been pursued by congress with regard to all the territories subsequent to the time when the Kentucky court was established. In the original organization of the judiciary of the United States, Kentucky and Maine were excluded from the arrangement of circuits. And, as no circuit court was required in law to be held there, the district court was vested with circuit court jurisdiction. This is the whole purport of the act of 1789, referred to in the Florida act of 1824. The other act there referred to, to wit, that of 1793, has no other operation as to the Kentucky court, besides vesting in it the power given to the circuit courts to hold special sessions. If the Florida act were as broad in its operation as the two

acts referred to, it would indeed be a serious question, whether the legislature of Florida could divest its superior court of any 'part of its admiralty jurisdiction, as existing in and exercised by the district courts of the United States. But I think it incontestable that the jurisdiction here given is explicitly restricted to so much of the jurisdiction of the Kentucky court only as comes within the description of cases arising under the laws and constitution of the United States. Now, excepting in the single instance of the present Bank of the United States, congress never has vested a jurisdiction even in its circuit courts, generally, over causes arising under the constitution and laws of the United States. It has given an appellate jurisdiction, and that only to the supreme court, over causes of that description, when such causes arise in the state courts, but we look in vain through the law defining the jurisdiction of the Kentucky court for any general claim to jurisdiction under the description of "cases arising under the laws and constitution of the United States." Yet, very ample operation must be given to these words of the Florida act, considered in reference to the jurisdiction actually possessed and exercised by the Kentucky court, under the two laws of 1789 and 1793. The land laws, revenue laws, laws of trade, criminal laws, and many other public laws, were all laws of the United States, under which cases might arise, and over which the Kentucky court was undoubtedly vested with jurisdiction. Nor do I doubt that the admiralty jurisdiction over revenue cases, as exercised by the Kentucky court, is rightfully vested (and that beyond the control of the Florida legislature) in the superior court of this district. But here, it appears to me, the grant of jurisdiction terminates. The admiralty jurisdiction, beyond this limit, is left to be administered under the laws of the territory, for this simple reason, that other causes, occurring in the admiralty, cannot be brought within this description of causes, arising under the laws of the United States. At least this appears incontrovertible, when applied to questions of salvage arising on wreck of the sea—to questions of salvage on captures as prize of war, I am inclined to think it would extend, at least, to all causes, in which the distribution of prize money depends upon laws of the United States. But it is argued that this is a cause arising under the laws of the United States, within the reason of the decision of the supreme court, in the case of Osborn v. Bank of U. S.; that the validity of the sale, divesting the interests of these libelants, depends upon the legality of the powers exercised by the court of Key West, which depends upon the powers vested in the legislature of Florida, which finally depends upon the acts of congress which created the body politic of Florida: that creating a body politic, is only creating a body

corporate on a larger scale, but essentially the exercise of one and the same power; that whether the one or the other sues or defends, legislates or acts, by itself or its agents, all must be done with reference to the law that creates and organizes it; and in fine, in the language of the court, in the case cited, "the charter not only creates it, but gives it every faculty that it possesses. The power to acquire rights of any description, to transact business of any description, to sue on those contracts, is given and measured by its charter, and that charter is a law of the United States. This being can acquire no right, make no contract, bring no suit, which is not authorized by a law of the United States. It is not only itself the mere creature of the law, but all its actions, and all its rights, are dependent on the same law," &c.

I have taken a week to reflect upon this question alone, and I cannot withhold from the gentleman, who argued the cause for the libelants, an acknowledgment, that I have not been able to draw any line of discrimination, between this and the decided cause, which satisfies my mind. Yet, I am thoroughly persuaded that the learned men who decided that cause, never contemplated that such an application would have been given of their decision. I am happy in the prospect that this cause will finally be disposed of elsewhere, not doubting that the mental acumen of those who decided the other, will be found fully adequate to distinguish or reconcile the two cases, on grounds which have escaped my reflections. At present, I must content myself with observing, that it is too much to require of a court. upon mere analogy, to sustain an argument that not only proves too much, if it proves anything, but which leads, in fact, to positive absurdity. It will be recollected that it is not only in the territories that we find bodies politic created by the laws of the United States, but that near one-half the states derive their origin and admission into the Union under laws of the United States. But will it be contended that all the causes arising under their laws, are causes arising under laws of the United States? It is true, that in the District of Columbia, the appellate jurisdiction given to the supreme court, can be maintained only on the ground that the laws of that District are laws of the United States: and that all the laws of the district of Florida derive directly, or indirectly, their force from the same origin. But in the case of the District of Columbia, this power is expressly given to the supreme court, and we are not now inquiring whether congress might not have vested this jurisdiction in the superior court of Florida, but whether they have so vested it. The simple inquiry is, what force and operation is to be given to those words, in the second section of the act of 1824, "Jurisdiction in all cases arising under the laws and constitution of the United

States?" And what could be more absurd than to decide that the same force is to be given to those words as if they were not there? Expunge that sentence altogether, and the construction of the clause will be necessarily and precisely that contended for by the libelants, to wit, an unrestricted grant of the jurisdiction vested by law in the Kentucky court. It not unfrequently happens, that in the construction of a whole law, or a section, or a clause of law, words, or even sentences, are declared surplusage, or irreconcilable with other words or sentences; but here we are called upon to give a meaning to words, which deprives them of all meaning, and that without any incongruity with other words, or want of distinct meaning in themselves, but from an analogy with another case, in which similar words have received a construction which produces that consequence, when applied to these words. Until better advised, I must maintain that these words have a definite meaning and bearing in their place in this law, and amount to a restriction of the jurisdiction of the superior court of Florida to a class of cases which does not comprise salvage on wreck of the sea.

Some minor grounds have been dwelt upon in argument, of which it is proper to take a brief notice. It has been argued, that the superior court of Florida acquired jurisdiction in another way, to wit, that the 9th section of the Florida act of 1822 makes of force in the territory all public laws of the United States not repugnant to the provisions of that act; that the judiciary acts are acts of that description, and, therefore, are laws of the territory. But this argument is without point, until such an organization of circuit and district courts of the United States takes place in that territory as will admit of the application of this law to the jurisdiction of its courts; or, rather, it takes effect as to the subject now under consideration only through those clauses which relate to the jurisdiction of the Kentucky court, and thus returns, in a circle, to the argument which we have been before considering.

It has also been contended that the Florida act, under which the court at Key West was organized, is void, 1st, because never ratified by congress; and 2nd, because inconsistent with that provision of the first section of the act of 1824, which gives original jurisdiction to the superior courts of the territory in all cases of $100 in value. To the first of these reasons, the 5th section of the act of 1822 furnishes an unequivocal answer. It is only the right of repealing that congress retains over the laws of Florida. That clause which requires the governor to report the laws of the territory to the president, to be laid before congress, is merely directory, but has no bearing upon the validity of those laws, until repealed. The words are "which, if disapproved by con-

gress, shall thenceforth be of no force;" necessarily implying their previous operation. With regard to the second, I have no doubt but that the individual who chooses to resort to his common law remedy, of an action for work and labor, instead of libeling for salvage, may maintain an original suit in the superior court of the territory. But I see nothing in the act which makes that jurisdiction exclusive, in a case in which both remedies are open to the choice of the party. The language of the 6th section is, "that the judicial power shall be vested in two superior courts, and in such inferior court and justices of the peace as the legislative council of the territory may from time to time establish." The 7th section of this act, and the 2d of the subsequent act, confine to the superior courts exclusively the jurisdiction over the cases arising under the laws, &c., of the United States, of which the Kentucky court had jurisdiction; but as to all others, I perceive nothing in the law which precluded the Florida legislature from making any distribution of jurisdiction, consistent with preserving to the superior court a concurrent jurisdiction, to be exercised according to its own terms.

It is proper to remark here, that whatever may be the fact as to the integrity and propriety, which regulate the proceedings of the court of Key West, there is nothing novel or unprecedented in the organization of that court. The model of it is of great antiquity, and throughout the civilized world some such summary mode of adjusting salvage, in cases of wreck of the sea, is to be found. We had just such a court here, and I believe in most of the states, when the constitution was adopted; and although jurisdiction of the subject has been everywhere abandoned to the district courts of the United States, where it is generally adjusted with great solemnity and discretion, and, I believe, very much to the satisfaction of all the commercial world, there exists no reason to preclude the congress of the United States from constituting similar summary tribunals, whenever and wherever it may become necessary. The establishment of this tribunal, therefore, however justice may be distributed in it, is no unwarrantable exercise of the legislative or judicial power vested in Florida.

Finally, I am of opinion that there is error in the decision of the district court, and adjudge that it be reversed, and the goods restored to the claimant with costs.

[NOTE. The decision of the circuit court was affirmed on appeal by the supreme court, Chief Justice Marshall rendering the opinion, in the course of which he said: "The constitution confers absolutely on the government of the Union the powers of making war and of making treaties. Consequently, that government possesses the power of acquiring territory, either by conquest or by treaty. The usage of the world is, if a nation be not entirely subdued, to consider the holding of conquered territory as a mere

military occupation, until its fate shall be determined at the treaty of peace. If it be ceded by that treaty, the acquisition is confirmed, and the ceded territory becomes a part of the nation to which it is annexed, either on the terms stipulated in the treaty of cession, or on such as its new master shall impose. On such transfer of territory, it has never been held that the relations of the inhabitants with each other undergo any change. Their relations with their former sovereign are dissolved, and new relations are created between them and the government which has acquired their territory. The same act which transfers their country transfers the allegiance of those who remain in it; and the law, which may be denominated 'political,' is necessarily changed, although that which regulates the intercourse and general conduct of individuals remains in force, until altered by the newly-created power of the state. On the 2d of February, 1819, Spain ceded Florida to the United States. * * * This treaty is the law of the land, and admits the inhabitants of Florida to the enjoyment of the privileges, rights, and immunities of the citizens of the United States. They do not, however, participate in political power, they do not share in the government, till Florida shall become a state. In the mean time Florida continues to be a territory of the United States, governed by virtue of that clause in the constitution which empowers congress 'to make all needful rules and regulations respecting the territory or other property belonging to the United States.' * * * The powers of the territorial legislature extend to all rightful objects of legislation, subject to the restriction that their laws shall not be 'inconsistent with the laws and constitution of the United States.' * * * All the laws which were in force in Florida while a province of Spain, those excepted which were political in their character, which concerned the relations between the people and their sovereign, remained in force until altered by the government of the United States. Congress recognizes this principle, by using the words 'laws of the territory now in force therein.' No laws could then have been in force but those enacted by the Spanish government. If, among these, a law existed on the subject of salvage,—and it is scarcely possible there should not have been such a law,—jurisdiction over cases arising under it was conferred on the superior courts, but that jurisdiction was. not exclusive. A territorial act, conferring jurisdiction over the same cases on an inferior court, would not have been inconsistent with the 7th section of the act of 1823, vesting the whole judicial power of the territory 'in two superior courts, and in such inferior courts and justices of the peace as the legislative council of the territory may from time to time establish.' * * * The 11th section of the act declares 'that the laws of the United States relating to the revenue and its collection, and all other public acts of the United States, not inconsistent or repugnant to this act, shall extend to, and have full force and effect in, the territory aforesaid.' The laws which are extended to the territory by this section were either for the punishment of crime or for civil purposes. Jurisdiction is given in all criminal cases by the 7th section, but in civil cases that section gives jurisdiction only in those which arise under and are cognizable by the laws of the territory. Consequently all civil cases arising under the laws which are extended to the territory by the 11th section are cognizable in the territorial courts, by virtue of the 8th section; and in those cases the superior courts may exercise the same jurisdiction as is exercised by the court for the Kentucky district. * * * The constitution and laws of the United States give jurisdiction to the district courts over all cases in admiralty; but jurisdiction over the case does not constitute the case itself.

* * * The constitution declares that 'the judicial power shall extend to all cases in law and equity arising under this constitution, the laws of the United States, and treaties made, or which shall be made under their authority; to all cases affecting ambassadors or other public ministers and consuls: to all cases of admiralty and maritime jurisdiction.' The constitution certainly contemplates these as three distinct classes of cases, and, if they are distinct, the grant of jurisdiction over one of them does not confer jurisdiction over either of the other two. The discrimination made between them in the constitution is, we think, conclusive against their identity. A case in admiralty does not, in fact, arise under the constitution or laws of the United States. These cases are as old as navigation itself; and the law, admiralty and maritime, as it has existed for ages, is applied by our courts to the cases as they arise. It is not, then, to the 8th section of the territorial law that we are to look for the grant of admiralty and maritime jurisdiction to the territorial courts. Consequently, if that jurisdiction is exclusive, it is not made so by the reference to the district court of Kentucky. * * * The judges of the superior courts of Florida hold their offices for four years. These courts, then, are not constitutional courts, in which the judicial power conferred by the constitution on the general government can be deposited. They are incapable of receiving it. They are legislative courts, created in virtue of the general right of sovereignty which exists in the government, or in virtue of that clause which enables congress to make all needful rules and regulations respecting the territory belonging to the United States. The jurisdiction with which they are invested is not a part of that judicial power which is defined in the 3d article of the constitution, but is conferred by congress, in the execution of those general powers which that body possesses over the territories of the United States. Although admiralty jurisdiction can be exercised in the states in those courts only which are established in pursuance of the 3d article of the constitution, the same limitation does not extend to the territories. In legislating for them, congress exercises the combined powers of the general and of a state government. We think, then, that the act of the territorial legislature, erecting the court by whose decree the cargo of the Point a Petre was sold, is not 'inconsistent with the laws and constitution of the United States,' and is valid. Consequently, the sale made in pursuance of it changed the property." 1 Pet. (26 U. S.) 511.]