**CROSSE & BLACKWELL COMPANY, a corporation, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**No. 7719.**

United States Court of Appeals
Fourth Circuit.

Argued Nov. 10, 1958.

Decided Jan. 5, 1959.

James W. Cassedy, Washington, D. C., (A. Adgate Duer and Niles, Barton, Yost & Dankmeyer, Baltimore, Md., on brief), for petitioner.

Carleton A. Harkrader, Atty., Federal Trade Commission, Washington, D. C. (Earl W. Kintner, Gen. Counsel, and James E. Corkey, Asst. Gen. Counsel, Federal Trade Commission, Washington, D. C., on brief), for respondent.

Before SOBELOFF, Chief Judge, HAYNSWORTH, Circuit Judge, and THOMSEN, District Judge.

HAYNSWORTH, Circuit Judge.

We are not persuaded to adopt the literal view that a canner of soups, relishes, preserves and similar products, including a small number containing meat ingredients, is a packer within the meaning of the Packers and Stockyards Act of 1921, 7 U.S.C.A. §§ 181–195, 221–229, and as such is immune from an order of the Federal Trade Commission when, in connection with its general business, it violates § 2 of the Clayton Act, 15 U.S.C.A. § 13.

Crosse & Blackwell is a well-known canner of soups, marmalades, tomato products, pickles, relishes and other food products. It puts up and markets approximately 150 different products under the brand name "Crosse & Blackwell" and another 35 under the brand name "Keiler," its annual sales amounting to approximately $14,000,000. Among its products there are 14 which contain meat or meat stock as one of the ingredients,[1]

---

1. These 14 products, with their meat or meat stock content both before and after cooking are as follows:

| Name | Raw Percentage | Cooked Percentage |
|---|---|---|
| Liver and Beef Paste | 50% | 39% |
| Corned Beef Hash | 50 | 35 |
| Ham and Tongue Paste | 36 | 24 |
| Beef Stew | 25 | 18 |
| Lamb Stew | 25 | 18 |
| Chili Con Carne | 25.5 | 17.5 |
| Scotch Chicken Soup | 14 | .4 |
| Beef Noodle Soup | 20 | — |
| Vegetable Beef Soup | 19 | — |
| Chicken Noodle Soup | 13.8 | — |
| French Onion Soup | 12.5 | — |
| Vegetable Soup with Beef Stock | 10 | — |
| Chicken Rice Soup | 9.3 | — |
| Cream of Chicken Soup | 8.7 | — |

and which collectively account for something less than three per cent of the annual sales of all of the products of Crosse & Blackwell. The meat content of these products is derived from cuts which Crosse & Blackwell purchases from slaughter houses and which it then trims, bones, cuts, mixes and cooks for subsequent mixing with other ingredients in the cans. Because it processes meats, Crosse & Blackwell obtained registration from the Department of Agriculture under the Meat Inspection Act, 21 U.S.C.A. §§ 71–95, as it was required to do, and officials of that Department supervise and inspect Crosse & Blackwell's plant and operations, insofar as they relate to meat products, on an almost daily basis.

Crosse & Blackwell sells its products through jobbers and wholesalers, or directly, to grocery stores and other retailers of food products. It was charged with having violated § 2 of the Clayton Act by giving credit to certain retailers for advertising Crosse & Blackwell products when such credits were not given or offered to competitors of the favored retailers. For the purpose of this proceeding, Crosse & Blackwell conceded that there would be substantial evidence that it had followed the questioned practice, chose not to stand upon its denial of the charges on the merits and elected to defend solely upon the ground that, because of its processing of meat, it is a packer within the meaning of the Packers and Stockyards Act of 1921. This contention leads Crosse & Blackwell to the conclusion that exclusive jurisdiction to question its trade practices, with re-

spect to all of its products, is lodged in the Secretary of Agriculture, and that such jurisdiction has been wholly withdrawn from the Federal Trade Commission. The argument is that what Crosse & Blackwell does with meats to be used as an ingredient in some of its products subjects it to the Packers and Stockyards Act of 1921, 7 U.S.C.A. § 191, which, by definition of a "packer," regulates activities of "any person engaged in the business * * * (b) of manufacturing or preparing * * * meat food products for sale or shipment in commerce * * *." It contends that its products containing meat are "meat food products," which the Act defines as the edible products of the slaughtering and meat packing industry, and that it is engaged in the business of preparing them for sale and shipment in commerce. Since § 202 of the Packers and Stockyards Act of 1921 (7 U.S.C.A. § 192) prohibits any packer from engaging in certain unfair trade practices and § 203 (7 U.S.C.A. § 193) authorizes the Secretary of Agriculture, after appropriate proceedings, to prevent the continuance of such unlawful practices, Crosse & Blackwell, concludes that, as a packer, it is subject to the restraints of the Packers and Stockyards Act, and by § 406 of that Act (7 U.S.C.A. §§ 226–227) as well as by § 5(a) (6) of the Federal Trade Commission Act (15 U.S.C.A. § 45(a) (6)) the jurisdiction of the Secretary of Agriculture is exclusive and the Federal Trade Commission powerless to proceed against it.[2] The Trial Examiner agreed with Crosse & Blackwell, but the Commission reversed,

---

2. The relevant sections of the several statutes, prior to the 1958 Amendments, are:

§ 2(a) (3). "The term 'meat food products' means all products and by-products of the slaughtering and meat-packing industry—if edible."

§ 2(a) (5). "The term 'livestock products' means all products and by-products other than meats and meat food products) of the slaughtering and meat-packing industry derived in whole or in part from livestock * * *."

§ 201. "* * * The term 'packer' means any person engaged in the business (a) of buying livestock in commerce for purposes of slaughter, or (b) of manufacturing or preparing meats or meat food products for sale or shipment in commerce, or (c) of manufacturing or preparing livestock products for sale or shipment in commerce, or (d) of marketing meats, meat food products, livestock products, dairy products, poultry, poultry products, or eggs, in commerce; but no person engaged in such business of manu-

and Crosse & Blackwell has brought its legal contention here for decision.

We may start with the assumption that if the only business of Crosse & Blackwell was the preparation and sale of corned beef hash, and its other products containing meat, we would agree that its products were "meat foot products," its business that of a "packer," and its trade practices subject to regulation under the Packers and Stockyards Act and beyond the reach of the prohibitive powers of the Federal Trade Commission. United Corporation v. Federal Trade Commission, 4 Cir., 110 F.2d 473; Trunz Pork Stores, Inc. v. Wallace, 2 Cir., 70 F.2d 688. Its total activity is not to be finally characterized upon a look at a small portion of the whole, however, and we must inquire whether its general business is the sort which Congress intended to, and did,

withdraw from the jurisdiction of the Federal Trade Commission.

As Mr. Justice Frankfurter has said, [3] this " * * * statute, like other living organisms, derives significance and sustenance from its environment, from which it cannot be severed without being mutilated. Especially is this true where the statute, like the one before us, is part of a legislative process having a history and a purpose. The meaning of such a statute cannot be gained by confining inquiry within its four corners. Only the historic process of which such legislation is an incomplete fragment—that to which it gave rise as well as that which gave rise to it—can yield its true meaning. * * * " It behooves us, therefore, to refer briefly to the problem which the Congress sought to resolve and the purpose to be served when the

facturing or preparing livestock products or in such marketing business shall be considered a packer unless—

"(1) Such person is also engaged in any business referred to in clause (a) or (b) of this section, or unless

"(2) Such person owns or controls, directly or indirectly, through stock ownership or control or otherwise, by himself or through his agents, servants, or employees, any interest in any business referred to in clause (a) or (b) of this section, or unless

"(3) Any interest in such business of manufacturing or preparing livestock products, or in such marketing business is owned or controlled, directly or indirectly, through stock ownership or control or otherwise, by himself or through his agents, servants, or employees, by any person engaged in any business referred to in clause (a) or (b) of this section, or unless

"(4) Any person or persons jointly or severally, directly or indirectly, through stock ownership or control or otherwise, by themselves or through their agents, servants, or employees, own or control in the aggregate 20 per centum or more of the voting power or control in such business of manufacturing or preparing livestock products, or in such marketing business and also 20 per centum or more of such power or control in any business referred to in clause (a) or (b) of this section."

§ 202. "It shall be unlawful for any packer or any live poultry dealer or handler to:

"(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce; or * *."

§ 406(b). "So long as this chapter remains in effect, the Federal Trade Commission shall have no power or jurisdiction so far as relating to any matter which by this chapter is made subject to the jurisdiction of the Secretary except when the Secretary of Agriculture, in the exercise of his duties hereunder, shall request of the said Federal Trade Commission that it make investigations and report in any case."

Federal Trade Commission Act, § 5(a) (6). "The Commission is empowered and directed to prevent persons, partnerships, or corporations, except banks, common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to the Civil Aeronautics Act of 1938, and persons, partnerships, or corporations subject to the Packers and Stockyards Act, 1921, except as provided in section 227(b) of Title 7, from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."

3. United States v. Monia, 317 U.S. 424, 432, 63 S.Ct. 409, 413, 87 L.Ed. 376, 382.

Packers and Stockyards Act of 1921 was enacted.

The Packers and Stockyards Act of 1921 has a long legislative history which began with realization of the tremendous potential power of the five great packing companies of that day to control both the prices of livestock and the price to the consumers of meat products. The stockyards and slaughtering centers, controlled by a handful of interests, were a bottleneck through which the livestock had to move on the way to the ultimate consumer, and those in control at the bottleneck were in position to misuse power to the detriment both of the producer and of the consumer. It was thus thought a proper and essential governmental purpose to provide controls of the prices and practices of the stockyards and packers, so that the interests of the producers, who sold their livestock through the established channels, and the purchasing public, who were dependent upon the packers for their supplies of meat, would be protected from the monopolistic power of those in control of the marketing facilities. The problem and the purpose were summarized by Mr. Chief Justice Taft in Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 401, 66 L.Ed. 735, when he said:

"* * * The object to be secured by the act is the free and unburdened flow of live stock from the ranges and farms of the West and the Southwest through the great stockyards and slaughtering centers on the borders of that region, and thence, in the form of meat products, to the consuming cities of the country in the Middle West and East, or, still as live stock, to the feeding places and fattening farms in the Middle West or East, for further preparation for the market.

"The chief evil feared is the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper who sells, and unduly and arbitrarily to increase the price to the consumer who buys. Congress thought that the power to maintain this monopoly was aided by control of the stockyards. Another evil which it sought to provide against by the act was exorbitant charges, duplication of commissions, deceptive practices in respect to prices, in the passage of the live stock through the stockyards, all made possible by collusion between the stockyards management and the commission men, on the one hand, and the packers and dealers on the other. * * *

* * * * * *

"The act * * * treats the various stockyards of the country as great national public utilities to promote the flow of commerce from the ranges and farms of the West to the consumers in the East."

■ The Packers and Stockyards Act would never have been adopted by the Congress if the marketing of livestock and the distribution of meat products did not present problems which, in the view of the Congress, were insufficiently met by the antitrust laws of general application. The problems were peculiar to agriculture, and it was appropriate that the regulatory responsibility be placed upon the Secretary of Agriculture and removed from the Federal Trade Commission. That one enterprise should not be subject to conflicting regulation in the same field, the Congress was careful to provide that the Federal Trade Commission should have no jurisdiction to proceed against any business subject to regulation by the Secretary of Agriculture under the Packers and Stockyards Act, but it is clear that the substance of what was intended to be withdrawn from the controls of the Federal Trade Commission and subjected to regulation by the Secretary of Agriculture were the businesses of the stockyards and of the packers as those industries were known and understood at the time. Doubtless the Congress did not anticipate that a great steel company might attempt to escape the restraints of the

antitrust laws by operating a small packing plant, taking the position that it was engaged in the business of a packer and was thus subject, in its steel business, to regulation only by the Secretary of Agriculture under the Packers and Stockyards Act, or that a canner of miscellaneous food items might avoid compliance with the general antitrust laws solely by reason of the fact that it used a relatively small quantity of meat as an ingredient in some of its products, for it did not expressly provide in 1921 that one engaged in parallel businesses, or in peripheral activity, would be subject to regulation as a packer under the Packers and Stockyards Act to the extent that he was engaged in that business and subject to regulation under the general antitrust laws to the extent he was engaged in other businesses. Whatever doubt there may have been on that score has been removed by the adoption of Public Law 909, 85th Congress, approved September 2, 1958, 72 Stat. 1749. But if we look to the language of the Act prior to the 1958 amendment, in the light of the purposes the Congress in 1921 clearly intended to serve, there seems no doubt that it was never intended that relatively inconsequential activity which might be classified as meat packing should insulate all of the other activities of a corporation from the reach of the Federal Trade Commission.

The language of the Act is susceptible to the construction that one engaged in the business of processing meats for sale is subject to regulation in that business as a packer under the Packers and Stockyards Act, while any other business in which he may be engaged is subject to the general restraints of the antitrust laws, and that jurisdiction to enforce the antitrust laws was left in the Federal Trade Commission, except insofar as the businesses of the stockyard and packing industry, as such, were removed from the jurisdiction of the Federal Trade Commission. It is the business of a packer which is subjected to regulation under the Act and § 406(b) withdraws from the jurisdiction of the Federal Trade Commission only such businesses. That section provides that the Commission "shall have no power or jurisdiction so far as relating to any matter which by this Act is made subject to the jurisdiction of the Secretary * * *," which is an exclusion not of persons nor of corporate entities, nor of affiliated enterprises, but of integrated activities which were intended by the Act to be subjected to the regulatory controls of the Secretary of Agriculture.

The difficulty comes from the Federal Trade Commission Act, which prior to the 1958 amendment exempted "persons, partnerships or corporations subject to" the Packers and Stockyards Act, but it is not reasonable to suppose that the Congress intended the limitations upon the jurisdiction of the Federal Trade Commission to be more extensive than the regulatory powers conferred upon the Secretary of Agriculture and intended by the Congress to be exercised effectively by him. Harmonious reconciliation of the several statutory provisions can be achieved in the light of the apparent statutory scheme to subject the business of the packer and the stockyard operator to the regulatory control of the Secretary of Agriculture, whose department was particularly concerned with the problem and who had the means of effectively discharging the responsibility, while enforcement of the general antitrust laws, as they applied to other businesses than that of packers and stockyard operators, was left to the Federal Trade Commission, each exercising its particular functions in its own special field where a single corporation was engaged in activities, some of which were and some of which were not subject to regulation under the Packers and Stockyards Act.

We construe the Act, as we must, to effectuate the apparent purpose and intention of the Congress. United States v. Champlin Refining Co., 341 U.S. 290, 71 S.Ct. 715, 95 L.Ed. 949; United States v. American Trucking Associa-

tions, 310 U.S. 534, 60 S.Ct. 1059, 84 L. Ed. 1345; McKee v. United States, 164 U.S. 287, 17 S.Ct. 92, 41 L.Ed. 437; Lessee of Brewer v. Blougher, 14 Peters, 39 U.S. 178, 10 L.Ed. 408; Minor v. Mechanics' Bank, 1 Peters, 26 U.S. 46, 7 L.Ed. 47. A literal interpretation of the exemption of § 5(a) (6) of the Federal Trade Commission Act must be laid aside for it is "plainly at variance with the policy of the legislation as a whole," Ozawa v. United States, 260 U.S. 178, 43 S.Ct. 65, 67, 67 L.Ed. 199; United States v. N. E. Rosenblum Truck Lines, 315 U.S. 50, 62 S.Ct. 445, 86 L.Ed. 671; United States v. American Trucking Associations, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345, and if held to grant a more extensive exemption than the Secretary's regulatory power would produce an absurd result. United States v. American Trucking Associations, 310 U. S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345; Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413; United States v. Ryan, 284 U.S. 167, 52 S.Ct. 65, 76 L.Ed. 224; Rector, Etc., of Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226.

█ We do not overlook the fact that a retailer or manufacturer of non-edible livestock products was made subject to the Packers and Stockyards Act if he should own more than a twenty per cent interest in a packer or a stockyard. The integration of the operations of stockyards and packers with those of retailers of meat products or of the manufacturers of other livestock products requires extension of the control of the primary regulatory agency. There is much reason for the belief that a vertically integrated business which handles meat through all of the steps from the hoof to the hand of the ultimate consumer may be effectively regulated only if the regulatory responsibility is lodged in one agency. Such beliefs and considerations, however, find no basis in the bare fact that different businesses in parallel may be lodged under the same corporate roof. The business of Crosse & Blackwell may be said to be unitary, but that of a canner of miscellaneous products is so far removed from that of the packing industry, upon which the attention of Congress was focused, that it may be said to have been reached by the Act, if at all, only to the extent it is actually concerned with the processing of meats.

The proceeding here arose out of the general conduct of the business of Crosse & Blackwell. It concerns credits for advertising its products in general, not just that small proportion of its products which contain meat ingredients. The problem is not one of those associated with the problem sought to be met by the Packers and Stockyards Act, nor is it one with which the Secretary of Agriculture is primarily concerned. It is a problem commonplace to the Federal Trade Commission, one which it has the general responsibility of meeting and which it may handle without prejudice to the effective performance of the functions of the Secretary of Agriculture under the Packers and Stockyards Act.

We conclude that Crosse & Blackwell was subject to the jurisdiction of the Federal Trade Commission when charged in the complaint with having given discriminatory advertising credits for its general products, though a small proportion of them contained meat ingredients. Such a construction is required by the apparent purpose and intention of Congress. It avoids having the Secretary of Agriculture saddled with responsibility in areas far beyond the bounds of his concern. It permits the orderly enforcement of the antitrust laws by the particular agency established for that purpose, with only such necessary exceptions as arise from the effective regulatory activity of other agencies.

The petition to review will be denied and the order of the Federal Trade Commission will be affirmed.