**SOLOMON VALLEY FEEDLOT, INC., et al., Plaintiffs-Appellees,**

v.

**Earl BUTZ, Secretary of Agriculture, et al., Defendants-Appellants.**

**No. 76–1325.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted May 18, 1977.

Decided June 17, 1977.

Ben L. Krage of Kasmir, Willingham & Krage, Dallas, Tex. (Wilbur Leonard, Topeka, Kan., on the brief), for plaintiffs-appellees.

Mark N. Mutterperl, Atty., Appellate Section, Civ. Div., Dept. of Justice, Washington, D.C. (Rex E. Lee, Asst. Atty. Gen., Washington, D.C., Robert J. Roth, U. S. Atty., Wichita, Kan., and Leonard Schaitman, Atty., Appellate Section, Civ. Div., Dept. of Justice, Washington, D.C., on the brief), for defendants-appellants.

Before LEWIS, Chief Judge, and BREITENSTEIN and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

In this declaratory judgment action instituted by Solomon Valley Feedlot, Inc., the issue presented is the extent of the applicability of the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. Section 181 *et seq.,* and particularly whether Solomon Valley Feedlot, Inc., which is engaged in cattle feeding, is also a dealer or a market agency under the applicable statute. Other members of the feedlot industry have participated as *amici curiae.*

The declaratory judgment finding and holding that the feedlots are not covered by the Act was entered on March 11, 1976. The appeal is on behalf of the Secretary of Agriculture and others.

The ultimate issue in the case is whether the registration and bonding provisions of the Stockyards Act, as amended, 7 U.S.C. Sections 203 and 204, together with the regulations promulgated pursuant to the statute, apply to the plaintiff and others. One section of the statute requires all "dealers" and "market agencies" to register with the Secretary of Agriculture and to post bonds. 7. U.S.C. Sections 203, 204; 9 C.F.R. 201.10, 201.27(c), 201.29. The statute defines a "dealer" as "any person, not a market agency, engaged in the business of buying or selling in commerce, livestock, either on his own account or as the employee or agent of the vendor or purchaser." 7 U.S.C. Section 201(d).

Dealers have been required to register under the Act since 1921. One purpose of the Act was to make sure that farmers and ranchers received true market value for their livestock and to protect consumers from unfair practices in the marketing of meat products. The early approach to marketing was through the stockyards and so the original Act applied to these markets. Later, however, packers and livestock dealers began to buy directly from producers and the public stockyard assumed less importance as a marketplace. As a result of this trend, the Act was amended in 1958. All dealers were, as a result of this amendment, required to comply with the statutory scheme regardless of where the cattle were bought or sold.

Until recently the custom feedlot has not been considered by the Department of Agriculture as a dealer. The Department now contends, however, that the feedlot has expanded its operation from merely feeding cattle to buying and selling services and is now a dealer. They point out that some feedlots have voluntarily registered as dealers. Since 1973, the Secretary through the packers and stockyards administration has been seeking to bring the feedlots under the authority of the Administration.

Based upon a finding of the Administration that Solomon was engaged in buying and selling, a notice was sent to Solomon that it was a dealer. Subsequently, on June 28, 1974, the present suit was filed seeking a declaratory judgment that Solomon and other feedlots of similar character were not dealers within the definition set forth in 7 U.S.C. Section 201.

The activity on the part of Solomon which is considered by the Administration

as that of a dealer is its aiding its customers in the purchasing of livestock which are then placed at the Solomon Feedlot for feeding until they reach the desired weight for slaughter. Solomon then aids in the sale of the cattle once they have achieved the desired weight.

One specific method of doing business is that Solomon takes calves for feeding which have been raised by the customer. Another approach is that Solomon through its employees aids in the purchase of cattle for customers from "order buyers." All of this livestock is fed and ultimately sold, with the aid of Solomon, to packer-buyers. It is these latter activities that are regarded by the government as constituting engaging in the business of selling livestock as the agent of the customer. Solomon purchases cattle at the request of a customer who specifies the number and the kind of calves it wishes to buy and the general manager of Solomon, Mr. Max Deets, gives his opinion as to the weight and type of cattle that can be most successfully fed. Deets contacts the sellers and on some occasions has inspected cattle to fill the request of the customer or purchaser. The invoice is sent to Solomon and it gives notice to the customer of the purchase. Ordinarily the packer-buyer of the cattle which have reached the desired weight inspects the cattle on Solomon's premises. The owner generally sets the price. If he has not done so, the offer is relayed to the seller. Sometimes Mr. Deets gives his opinion as to whether the offer is appropriate. Although the customers rely on the ability and the integrity of Solomon, Solomon is not paid any fee in connection with this work.

The ruling of the district court was that under these circumstances the Solomon Valley Feedlot, Inc. was not engaged in buying or selling in commerce livestock as the employee or agent of the vendor-purchaser. The court's position was that Solomon was engaged in the feeding of cattle only and that its connections with the purchase and sale of cattle were a mere incident to the feeding business. It also found and determined that requiring Solomon to obtain bond coverage and to submit to the regulation of the Packers and Stockyards Act would fail to protect anyone designed by the Act to be protected. It, therefore, concluded and adjudged accordingly that Solomon Valley Feedlot, Inc. and other custom feedlots who carried on business in the same manner were not subject to the registration and bonding provisions of the Act.

The government maintains that this ruling was error; that the Administrator of the Packers and Stockyards Act had correctly interpreted the statute so as to include the feedlots which function in the manner of those before the court within the statutory term "dealer," it being the position of the Administrator that Solomon is in fact and in law engaged in the business of buying and selling in commerce livestock as the employee or agent of the vendor or purchaser.

I.

The first question is whether the statute on its face embraces the feedlot as a market agent or dealer. Both sides concede that Solomon is not a market agency.

The statutory definition of "dealer" contained in Section 201(d) is:

. . . any person, not a market agency, engaged in the business of buying or selling in commerce livestock, either on his own account or as the employee or agent of the vendor or purchaser.

The question is then whether Solomon is in the business of buying or selling livestock in commerce either on its own account or as the employee or agent of the vendor or purchaser. The evidence does not establish that Solomon is engaged in the business of buying or selling as an agent of the vendor or purchaser. It is our conclusion that it is not so engaged.

Solomon as a cattle feeder makes its profit from feeding the cattle. This is in contrast to the dealer who profits from the transaction itself either by speculating on the market or by getting a commission. These individuals are truly in the business of buying or selling on their own account or as the employer-agent of the buyer or sell-

er. In contrast, here the profit comes from efforts in altering the animals by improving their value through feeding. The emphasis is then entirely different. If the feedlot charged the customer a fee for selling the cattle or if it received the sale price from the packer, it would be arguable that the feedlots including Solomon were dealers or marketing agents.

Our decision in *Kelley v. United States,* 202 F.2d 838 (10th Cir. 1953), relied on by the government is not helpful to them. Kelley was the owner of a private stockyard and was not as such subject to the Packers and Stockyards Act. The question was whether it was required to register and to give bond under Section 201, *supra.* The court through Judge Huxman pointed out that a dealer is not a commission man, rather that he is one who buys or sells livestock for himself or as the employee or agent of the vendor or purchaser. Kelley had been indicted for failure to register. The proximate transaction involved his purchase of 922 hogs for which he paid $40,471.28. He is also shown to have made many other purchases of livestock. It was held that he was a dealer because he was shown to have been in the business of buying or selling livestock in commerce. The court pointed out that these were not isolated transactions but constituted a course of conduct.

It is concluded then that while the discussion in *Kelley* of what constitutes a dealer has some clarifying value at bar, its holding is of limited significance here. This value is limited to its having placed some emphasis on the fact that Kelley's business was that of purchasing livestock for resale as a speculator and not for raising.

At bar Solomon's selling activity on behalf of the owners of the cattle was merely an accommodation to the owners. Solomon handled no money and was not engaged in any activity specified in Section 201, *supra.*

■ It would appear that the three groups of people engaged in purchasing livestock as dealers include (1) packers-buyers who are employed by packing plants to acquire cattle for slaughter; (2) commission people such as order-buyers; and (3) speculators, who buy in their own name to resell.

The literature of the Packers and Stockyards administration supports this view of the Act. *See* PA–399, *The Packers and Stockyards Act, What It Is—How it Operates.* The above groupings are recognized in that literature which also recognized the distinction between the one who is regulated because he is engaged in the business in accordance with the statute and one who makes profit as a result of improving the animals.

## II.

The purpose of the Act is to protect producers and consumers, and among the means employed to accomplish this purpose is the use of surety bonds. This is brought out by the 1976 amendment which made packers subject to the bonding requirement of the Act. This amendment resulted, according to the legislative history and particularly Senate Report No. 94–932, 3 U.S. Code Cong. and Admin.News, pp. 2267, 2270–71 (1976), from the need for requiring the packers to be bonded. This Senate Report states:

Today the Department of Agriculture estimates that well over 80 percent of all slaughter livestock is purchased by packers directly from producers and custom feedlots.

The consequences of these changes in livestock marketing patterns are perhaps best reflected in statistics of the Packers and Stockyards Administration, which picture the results of the increased exposure of livestock producers to the risks created by certain business practices engaged in by members of the packing industry. Between 1958 and early 1975, 167 packers failed, leaving livestock producers unpaid for over $43 million worth of livestock.

It is plain, therefore, that the amendment came about because of the fact that the business had changed so that the packers were directly engaged in purchases from producers and feedlots. The fact that the

packers were having a number of business failures was the main reason for requiring that they be bonded. Congress was quite aware of the enhanced role of feedlots. So if it had seen the need for including feedlots within the sweep of the Act, it could have done so on the occasion of its expanding the regulation of packinghouses. Undoubtedly it was because these feedlots do not handle the proceeds of sales of cattle that caused Congress to not include them.

\* \* \*

In sum, since the wording of the statute falls short of including feedlots either expressly or impliedly and since the feedlots do not carry on activity that is within the general object and intent of Congress, we must conclude that they are not subject to the Act and, therefore, that the trial court was correct in so holding.

It follows that the judgment of the district court should be and the same is hereby affirmed.