Schlieper v. Johnson, 2007 NCBC 29

STATE OF NORTH CAROLINA

COUNTY OF GUILFORD

RICHARD SCHLIEPER and
WAYNE PYRTLE

   Plaintiffs,

  v.

HORACE M. "JAY" JOHNSON, JR.
and AXIOM INTERMEDIARIES,
LLC,

   Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
06 CVS 13099

)
)
)
)
)
)
)
)
)
)
)
)
)
)

ORDER ON DEFENDANTS' MOTION TO
DISMISS UNDER RULE 12(b)(6)

{1} This case arises out of Plaintiffs' suit for fraud, unfair and deceptive trade practices, negligent misrepresentation, and breach of contract. This matter comes before the Court on Defendants' Motion to Dismiss Under Rule 12(b)(6).

{2} After considering the briefs and oral arguments, the Court GRANTS in part and DENIES in part Defendants' Motion to Dismiss.

> *Forman Rossabi Black, P.A. by Amiel J. Rossabi and S. Brian Walker for Plaintiffs Richard Schlieper and Wayne Pyrtle.*
>
> *Ragsdale Liggett PLLC by Mary Hulett for Defendants Horace M. "Jay" Johnson, Jr. and Axiom Intermediaries, LLC.*

Tennille, Judge.

I.

PROCEDURAL BACKGROUND

{3} This action was filed in Guilford County Superior Court on December 28, 2006. The matter was designated a mandatory complex business case by order of

the Chief Justice of the Supreme Court of North Carolina dated February 1, 2007 and subsequently assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of the Chief Special Superior Court Judge for Complex Business Cases dated February 6, 2007.

{4} Defendants filed a Motion to Dismiss Under Rule 12(b)(6) on March 30, 2007. The Court heard oral arguments on the motion on May 24, 2007.


II.

FACTUAL BACKGROUND

A.

THE PARTIES

{5} Plaintiff Richard Schlieper is a resident of Alamance County, North Carolina.

{6} Plaintiff Wayne Pyrtle is a resident of Alamance County, North Carolina.

{7} Defendant Horace M. "Jay" Johnson, Jr. is a resident of Alamance County, North Carolina. At all times relevant to this action, Johnson was the president and chief executive officer of Axiom.

{8} Defendant Axiom Intermediaries, LLC ("Axiom") is a limited liability company organized and existing under the laws of the State of North Carolina with its principal place of business in Guilford County, North Carolina.

B.

THE ALLEGATIONS OF THE COMPLAINT

1.

EARLY YEARS AT R/I, INC.

{9} The parties to this action are involved in the reinsurance business. In the late 1970s, Johnson partially owned a reinsurance business known as R/I, Inc. ("R/I"). Schlieper had prior experience in the reinsurance industry, and took a position with R/I in or about October 1978. (Compl. ¶ 5.)

{10} Pyrtle commenced employment in R/I's claims department in the summer of 1988. (Compl. ¶ 7.)

{11}   In 1989, Johnson became the sole owner of R/I.  (Compl. ¶ 8.)  In June 1990, he sold R/I to Corroon & Black Corporation.  Later that year, Corroon & Black was itself purchased by Willis Group Holdings ("Willis").  After the sales, Johnson, Schlieper, and Pyrtle all remained employed by Willis.  (Compl. ¶ 9.)

{12}   In 1995, Pyrtle transitioned from the claims department to the brokerage side of the operation at Willis.  (Compl. ¶ 10.)

2.

FORMATION OF AXIOM

{13}   Johnson and Pyrtle left Willis for Aon Re, Inc. in 1999.  Schlieper continued to work for Willis.  (Compl. ¶ 11.)

{14}   In September 2000, Johnson purchased his share of the business from Aon Re and started his own business, Axiom Intermediaries.  (Compl. ¶ 12.)  Johnson offered Pyrtle a position with Axiom in which Pyrtle was to receive a five percent stake in the company's net profits.  Pyrtle accepted and began work in Axiom's brokerage department "even though his equity position was unilaterally lowered by Johnson to 2.5%."  (Compl. ¶ 14.)  Johnson also offered Schlieper a position with Axiom as Senior Vice President and Chief Financial Officer.  (Compl. Ex. B.)  Schlieper was to receive an annual salary of $125,000, a bonus to be determined, and a five percent stake in Axiom's net profits.  (Compl. ¶ 15, Ex. B.)  Schlieper accepted the offer and left Willis for Axiom.  (Compl. ¶ 16.)

{15}   In the fall of 2002, Schlieper signed a "Letter of Understanding" clarifying the details of his five percent stake in Axiom's profits.  (Compl. ¶ 18.)  Pyrtle also signed a Letter of Understanding at this time clarifying the details of his 2.5% stake in Axiom's profits.  (Compl. ¶ 19.)[1]  Pursuant to these Letters of Understanding,

---

[1] Copies of the following documents were attached to the Complaint and are properly before the Court on a Rule 12(b)(6) motion to dismiss:  (A) Change of Broker Agreement, (B) September 1, 2000 letter from Johnson to Schlieper offering employment at Axiom, (C) Schlieper's Letter of Understanding, (D) Pyrtle's Letter of Understanding, (E) December 12, 2005 letters to Schlieper and Pyrtle regarding sale of Axiom, (F) Schlieper Agreement to Terminate Letter of Understanding, (G) Production/performance bonus amounts paid to Pyrtle, (H) Production/performance bonus amounts paid to all Axiom employees, and (I) Acquisition Summary Form from Brown & Brown.  By Consent Order dated February 5, 2007, Exhibits A, G, H, and I were placed under seal.  The Answer included

Schlieper and Pyrtle received yearly profit distributions from 2002 until 2004. (Compl. ¶ 20.)

## 3.
## SALE TO BROWN & BROWN

{16} In December 2005, Johnson advised Schlieper and Pyrtle that he was considering selling Axiom to Brown & Brown, Inc. ("Brown"), and that the projected sale price was approximately $37 million. (Compl. ¶ 22.)

{17} On December 12, 2005, Schlieper and Pyrtle received letters (the "December 12 letters") from Johnson discussing the possible sale to Brown. These letters included a "Phantom Calculation" indicating the "Net Adjusted Phantom Sale Price" to be $35,213,677. (Compl. Ex. E.) Copies of the Phantom Calculations are attached to this Order. Pyrtle's letter stated that his production/performance bonus for 2005 was to be $75,000. (Compl. ¶ 24. Ex. E.)

{18} On December 29, 2005, Johnson told Schlieper and Pyrtle that Brown required the dissolution of the terms of their Letters of Understanding in order for the sale of Axiom to be completed. Johnson then presented them each with a document entitled "Agreement to Terminate Letter of Understanding." (Compl. ¶ 25, Ex. F; Answer Ex. 2.)

{19} In consideration for signing the Agreements to Terminate Letter of Understanding, Schlieper received $1,318,317 and Pyrtle received $659,408. (Compl. ¶ 26.)

## 4.
## DISAGREEMENT OVER AXIOM SALE PRICE

{20} In early 2006, Johnson allegedly indicated to Schlieper and Pyrtle that their 2005 profit distributions would be included in a payout from the sale of Axiom to Brown. Schlieper and Pyrtle allege that a 2005 profit distribution was not included in the payout. (Compl. ¶32.) Furthermore, Pyrtle only received a

---

copies of (1) Schlieper Phantom Calculation and (2) Pyrtle Agreement to Terminate Letter of Understanding.

production/performance bonus of $55,304, rather than the $75,000 promised to him by Johnson. (Compl. ¶ 33.)

{21} The sale of Axiom to Brown was finalized in January 2006. (Compl. ¶ 35.)

{22} In February of 2006, Schlieper and Pyrtle discovered that the purchase price for Axiom's assets recorded on Brown's books was much more than $35,213,677. Pyrtle learned of the higher sale price from a Brown insider who had access to information regarding the sale price of Axiom. (Compl. ¶ 37.)

{23} In the spring of 2006, Schlieper and Pyrtle had a series of meetings with Johnson in which they discussed the discrepancy between his representations as to the sale price of Axiom and the actual sale price. They demanded an increased payout from the sale, but Johnson refused. (Compl. ¶ 38.)

{24} Based on these allegations, Plaintiffs assert the following claims for relief:

1. Fraud;
2. Unfair and Deceptive Trade Practices;
3. Negligent Misrepresentation;
4. Breach of Contract.

## III.
## MOTION TO DISMISS

{25} Defendants have moved to dismiss Plaintiffs' Complaint for failure to state claims upon which relief can be granted under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. (Mot. Dismiss Under Rule 12(b)(6), at 1.)

### A.
### LEGAL STANDARD

{26} The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the pleading against which the motion is directed. *Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970). In *Branch Banking & Trust Co. v. Lighthouse Financial Corp.*, 2005 NCBC 3 (N.C. Super. Ct. July 13, 2005), http://www.ncbusinesscourt.net/opinions/2005%20NCBC%203.htm, this Court summarized the 12(b)(6) standard as follows:

When ruling on a motion to dismiss under Rule 12(b)(6), the court must determine "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted." In ruling on a motion to dismiss, the court must treat the allegations in the complaint as true. The court must construe the complaint liberally and must not dismiss the complaint unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim. When considering a motion under Rule 12(b)(6), the court is not required to accept as true any conclusions of law or unwarranted deductions of fact in the complaint. When the complaint fails to allege the substantive elements of some legally cognizable claim, or where it alleges facts which defeat any claim, the complaint should be dismissed under Rule 12(b)(6).

*Id.* ¶ 8 (citations omitted). In this case, it is also relevant that "[a] motion to dismiss a party's claim for lack of standing is tantamount to a motion to dismiss for failure to state a claim upon which relief can be granted according to Rule 12(b)(6)." *Slaughter v. Swicegood*, 162 N.C. App. 457, 464, 591 S.E.2d 577, 582 (2004).

{27}  Furthermore, the Court may not consider "extraneous matter" outside the complaint, or else the Rule 12(b)(6) motion will be converted into a Rule 56 motion for summary judgment. *See, e.g.*, *Fowler v. Williamson*, 39 N.C. App. 715, 717, 251 S.E.2d 889, 890–91 (1979). However, the Court may consider documents the moving party attaches to a 12(b)(6) motion which are the subject of the challenged pleading and specifically referred to in that pleading. *See Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001). "The Court is not required to accept as true any conclusions of law or unwarranted deductions of fact." *Id.* at 56, 554 S.E.2d at 844. Thus the Court can reject allegations that are contradicted by the supplementary documents presented to it. *See E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) (stating that the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments").

{28} The Plaintiff has moved to file an Amended Complaint. The Court has reviewed the proposed Amended Complaint and determined that the outcome of this Motion would not be altered by the filing of the Amended Complaint.

B.

ANALYSIS

{29} Prior to a detailed analysis of the claims, it is helpful to focus on the transaction giving rise to the claims. It is undisputed in the pleadings that the original Letters of Understanding were not triggered by the asset sale to Brown. Rather, Johnson reached an agreement with Schlieper and Pyrtle to terminate the Letters of Understanding in order to be able to consummate the asset sale to Brown. Thus, it is the Agreements to Terminate Letters of Understanding (Compl. Ex. F; Answer Ex. 2), rather than the Letters of Understanding themselves (Compl. Ex. C–D), which primarily underlie the present dispute and upon which the fraud and negligent misrepresentation claims are based.

1.

FRAUD

{30} In order to assert a claim for fraud against Defendants, Plaintiffs must allege facts which show that: (1) there was "a definite and specific representation," (2) the representation was materially false, (3) the representation was made with knowledge of its falsity or in culpable ignorance of its truth, (4) it was made with fraudulent intent, (5) it was reasonably relied upon by the other party, and (6) there was actual loss flowing from the alleged misrepresentation. *Lillian Knitting Mills Co. v. Earle*, 237 N.C. 97, 105, 74 S.E.2d 351, 356 (1953). In order to assert a claim for negligent misrepresentation against Defendants, Plaintiffs must allege facts which show: (1) the provision of false information, (2) given to guide others in a business relationship, and (3) without exercising reasonable care or diligence to determine the truthfulness or falsity of the information. *Fulton v. Vickery*, 73 N.C. App. 382, 388, 326 S.E.2d 354, 358 (1985). As to either fraud or negligent misrepresentation, "when the party relying on the false or misleading representation could have discovered the truth upon inquiry, the complaint must

allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999). On a motion to dismiss, the Court can reject allegations that are contradicted by the supplementary documents presented to it. *See E. Shore Mkts.,* 213 F.3d at 180.

{31} Plaintiffs claim Johnson misrepresented the "sale price" of Axiom to be $35.6 million, rather than the substantially higher purchase price that appeared on Brown's books. (Compl. ¶¶ 24, 36.) The documents attached to the Complaint indicate there was no such misrepresentation. Unfortunately, the term "sale price" has multiple meanings in this case, and Plaintiffs have not been precise in their use of the term in the Complaint. The first possible meaning of "sale price" has its roots in the Parachute Provision of the Letters of Understanding. The Parachute Provision provides "[i]f the majority ownership of the Company elects to sell the Company to a 3rd party while the Employee is an active employee of the Company, the Company will pay the Employee his share times the 'sale price' less his share times $7,000,000 plus an interest component." (Compl. Ex. C–D.) The provision then clarified that "[t]he 'sale price' as used in this section refers <u>only to the portion of the total selling price that is related to the Goodwill of the Company.</u> All other assets are to be excluded." (Compl. Ex. C–D (emphasis added).) Thus, the "sale price" for purposes of determining a payout under the Parachute Provision was not equal to the total selling price. The total selling price, composed of goodwill plus all other assets, is the second possible meaning of "sale price." As noted on the Acquisition Summary Form, the total purchase price was much higher than $35.6 million. Of this total, an amount was allocated to goodwill. The remainder of the purchase price was allocated to expirations, noncompete agreement, tangible property, and "other." (Compl. Ex. I.)

{32} The sale of Axiom to Brown was structured as a sale of assets. The Parachute Provision was only triggered "[i]f the majority ownership of the Company elects to sell the Company to a 3rd Party." (Compl. Ex. C–D.) The Parachute Provision was not triggered by the sale of assets to Brown. However, Brown

required Axiom to dissolve Plaintiffs' Letters of Understanding as a condition of the sale. In letters dated December 12, 2005, Johnson offered Schlieper $1,318,817 and Pyrtle $659,408 "representing the dissolution of the Phantom Stock Plan and your contributions to Axiom for the past, present, and envisioned in the future." (Compl. Ex. E (Pyrtle); Answer Ex. 1 (Schlieper).) Attached to the December 12 letters were sheets entitled "Phantom Calculation." These sheets showed how Axiom arrived at the above figures. The calculations detailed in the "Phantom Calculation" sheets follow the formula set forth in the Parachute Provision. They start with a "Net Adjusted Phantom Sales price" of $35,213,677. This figure is clearly noted as the <u>Phantom</u> Sale Price, not to be confused with the total sale price. As explained above, the term "sale price" as defined in the Letters of Understanding creating the phantom interests referred "<u>only to the portion of the total selling price that is related to the Goodwill of the Company.</u>" (Compl. Ex. C–D.) The Net Adjusted Phantom Sale Price was then multiplied by Plaintiffs' shares of Axiom's net profits—2.5% for Pyrtle, 5% for Schlieper. From this total, Axiom subtracted the "share times $7,000,000 plus an interest component." (*See* Compl. Ex. C–D.) Based on the documents, it is clear that the "Phantom Calculation" used to determine Plaintiffs' compensation for terminating their Letters of Understanding was based on the Parachute Provision, and that the "Net Adjusted Phantom Sale Price" referred only to the portion of the total sale price allocated to goodwill.

{33}  Plaintiffs' Complaint alleges that "[t]he [December 12] letters discussed the prospect of the sale to Brown, and represented the <u>sale price</u> of Axiom to Brown, Inc. to be $35.6 million" (Compl. ¶ 24) and that Plaintiffs "trusted that Johnson would be honest in his representations . . . regarding Axiom's <u>actual sale price</u>" (Compl. ¶ 31). A review of the December 12 letters and the attached Phantom Calculations contradict this allegation. The letters do not represent the "sale price" or the "actual sale price" to be $35.6 million. The terminology in the letters is more precise. The letters use an adjusted net income "for Phantom Sales Calculation" to derive a "<u>Net Adjusted Phantom</u> Sale Price" of $35,213,677. The letters do not represent that the "actual sale price" of Axiom was to be $35.6 million or that the

payout being offered to Plaintiffs would be based on the total final sale price to Brown. The Phantom Sale Price based on the Letters of Understanding was limited to goodwill.

{34} The calculations included with the December 12 letters are very detailed and make clear that the amounts offered to Plaintiffs in consideration for terminating their Letters of Understanding were based on a "Phantom" sale price. There may have been some potential for confusion due to the structure of the deal. As noted above, the purchase of assets by Brown did not trigger the Parachute Provision. Nevertheless, it is clear that Axiom used the formula from the Parachute Provision to calculate the amounts offered to Plaintiffs in the December 12 letters. That was logical since Johnson was buying out Plaintiffs' rights under the Parachute Provision.

{35} In the event this was not clear to Plaintiffs when they received and reviewed their letters, they had ample opportunity to ask questions of Johnson. After the letters were sent, seventeen days passed before Plaintiffs signed the Agreements to Terminate their Letters of Understanding. (*See* Compl. Ex. F; Answer Ex. 2.) In the December 12 letters, Johnson invited discussion, telling Plaintiffs "[i]f you have any questions or concerns, please discuss them with me immediately." (Compl. Ex. E.) Plaintiffs had ample time to ask questions, and were in a position to do so. Schlieper had known Johnson since at least 1978 (Compl. ¶ 5), and Pyrtle had known him since at least 1988 (Compl. ¶ 7). Schlieper describes Johnson as a "longtime friend and trusted business partner." (Compl. ¶ 16.) Both Schlieper and Pyrtle are experienced and sophisticated businessmen—Schlieper was Senior Vice President and Chief Financial Officer of Axiom. (*See* Compl. Ex. B.) As such, he would have been accustomed to reviewing financial calculations and questioning them if necessary.

{36} There are no allegations in the Complaint indicating that Schlieper or Pyrtle questioned Johnson or anybody else at Axiom about the amounts they were offered in the December 12 letters until after they had signed the Agreements to Terminate their Letters of Understanding. Given the longstanding relationship

between the Plaintiffs and Johnson, as well as their positions at Axiom, Plaintiffs could have sought clarification of the amounts offered in the December 12 letters. As such, the Complaint must allege they were either denied the opportunity to investigate or that they could not have learned the true facts by exercise of reasonable diligence. *See Hudson-Cole*, 132 N.C. App. at 346, 511 S.E.2d at 313. Plaintiffs do not allege they were denied the opportunity to investigate. (Cite Hearing Tr.) Indeed Johnson encouraged them to ask questions. (*See* Compl. Ex. E.) The Complaint alleges that Plaintiffs "could not have learned of the fraud of Johnson with due diligence." (Compl. ¶ 46.) This conclusory allegation is contradicted by the documents, the Plaintiffs' experience, and their relationship with Johnson as explained above.

{37} Had Schlieper and Pyrtle not agreed to the termination of their Letters of Understanding, there would have been no transaction triggering their right to receive payment for their phantom shares. They would not have received the large payouts. What Johnson offered and what they received was roughly equivalent to what they would have received under the Letters of Understanding. That was clear from the calculations given to them. If they had any question about how the dollar amount offered to them was calculated, they should have asked before signing and accepting their payments.

{38} Plaintiffs point out the discrepancy between the Net Adjusted Phantom Sales Price of $35,213,677 and the amount allocated to goodwill on the Acquisition Summary Form. (Br. Opp. Defs.' Mot. Dismiss 6–7.) The discrepancy in these figures does not result in a claim against Defendants for fraud or negligent misrepresentation. The Acquisition Summary Form is a Brown document, reflecting how Brown accounted for the acquisition. The December 12 letters did not represent that the amount allocated to goodwill on Brown's books would be $35,213,677, or that the Phantom Calculations were based on this figure. As Defendants note in their reply brief, there is no allegation that Defendants used the Acquisition Summary Form or even had access to it before making their offer to Plaintiffs in the December 12 letters. (Defs.' Reply to Pls.' Br. Opp. Defs.' Mot.

Dismiss 7.) This is another example of an issue that could have been clarified with questions from Plaintiffs.

{39}   Plaintiffs also argue that it was fraudulent or negligent for Johnson not to disclose that in accounting for the transaction, expirations[2] would not be included as part of goodwill. According to Plaintiffs, the placement of expirations into a separate category from goodwill "raises concerns, because insurance expirations are almost always inseparable from goodwill." (Br. Opp. Defs.' Mot. Dismiss 7.) In support of this proposition, Plaintiffs cite *Newark Morning Ledger Co. v. United States*, 507 U.S. 546 (1993). There, the United States Supreme Court indicates that taxpayers carry a heavy burden to prove that expirations have an ascertainable value separate and distinct from goodwill. *Id.* at 560. However, the issue before the Court in *Newark Morning Ledger* was whether "the Internal Revenue Service (IRS) may treat as nondepreciable an intangible asset proved to have an ascertainable value and a limited useful life, the duration of which can be ascertained with reasonable accuracy, solely because the IRS considers the asset to be goodwill as a matter of law." *Id.* at 546. As such, the decision applies only in the context of interpreting a provision of the Internal Revenue Code, and has no bearing on the present situation. Moreover, Plaintiffs could have asked Johnson how the Net Adjusted Phantom Sale Price was calculated, and whether any assets would be listed separately from goodwill.

{40}   Plaintiffs also claim Defendants misrepresented that "[t]he 2005 profit distribution would be paid to Plaintiffs after the sale of Axiom." (Compl. ¶ 43.c.) Plaintiffs allege that "[i]n or about early 2006, Johnson represented to Schlieper and Pyrtle that the profit distribution for the year 2005 would be included in a payout from the sale of Axiom to Brown, Inc." (Compl. ¶ 32.) As explained below, Plaintiffs agreed to terminate the Letters of Understanding and their right to profit distributions in the December 29, 2005 Agreements to Terminate Letters of Understanding. At the time of the alleged misrepresentation, Plaintiffs had already

---

[2] Insurance expirations are lists that include information about currently insured individuals or businesses, policy expiration dates, and the amount of coverage.

agreed to give up their rights under the Letters of Understanding, including their rights to a share in Axiom's profits for 2005. Regardless of what Johnson may have indicated in early 2006, it was not reasonable for Plaintiffs to rely on his statements given the termination of their rights under the Letters of Understanding.

{41} Plaintiffs' claims for fraud and negligent misrepresentation are dismissed. As reflected in the foregoing discussion, the Court continually returns to the fact that neither Schlieper nor Pyrtle took advantage of their opportunity to investigate the facts presented to them in the December 12 letters. The calculations could have been clarified upon inquiry, but none was ever made. There are no allegations that Defendants denied Plaintiffs the opportunity to investigate. In a case such as this, where the parties relying on the allegedly misleading statements could have discovered any underlying facts upon inquiry, claims for both fraud and negligent misrepresentation should be dismissed. As to the claims based on the 2005 profit distributions—Plaintiffs abdicated their right to those distributions and cannot now claim they were mislead.

2.

UNFAIR OR DECEPTIVE ACTS OR PRACTICES

{42} Plaintiffs claim that "[t]he acts of Johnson in the course of this transaction constitute unfair or deceptive acts or practices in or affecting commerce, in violation of N.C. Gen. Stat. § 75-1.1." (Compl. ¶ 50.) For the reasons explained below, the Court concludes that Plaintiff's Complaint fails to state a claim under section 75-1.1 and therefore grants Defendants' Motion to Dismiss Plaintiff's second claim for relief.

{43} Section 75-1.1 states that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a) (2005). The statute goes on to clarify that "[f]or purposes of this section, 'commerce' includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." *Id.* § 75-1.1(b). In applying the statute, the Court must first address the threshold inquiry of whether the acts

complained of were "in or affecting commerce." *See Johnson v. Phoenix Mut. Life Ins. Co.*, 300 N.C. 247, 261, 266 S.E.2d 610, 620 (1980) (noting that "[b]efore a practice can be declared unfair or deceptive, it must first be determined that the practice or conduct which is complained of takes place within the context of the statute's language pertaining to trade or commerce[3]"), *overruled in part on other grounds by Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 569, 374 S.E.2d 385, 392 (1988). Whether an act is "in or affecting commerce" is a question of law for the Court to decide. *E.g.*, *Hardy v. Toler*, 288 N.C. 303, 310, 218 S.E.2d 342, 346–47 (1975). In order to establish a prima facie claim under section 75-1.1, a plaintiff must show: "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C. App. 650, 664, 464 S.E.2d 47, 58 (1995) (citations omitted). If the complaint does not allege acts in or affecting commerce, a plaintiff cannot establish a prima facie claim and dismissal under Rule 12(b)(6) is appropriate. *See, e.g.*, *Orange County v. N.C. Dep't of Transp.*, 46 N.C. App. 350, 379, 265 S.E.2d 890, 909 (1980) ("A claim should be dismissed under N.C. Rule Civ. Proc. 12(b)(6) where it appears that plaintiff is entitled to no relief under any statement of facts which could be proven, and such will occur when there is want of law to support a claim of the sort made, an absence of facts sufficient to make a good claim, or the disclosure of some fact which will necessarily defeat the claim." (citations omitted)).

{44} Despite a large number of legislative and judicial pronouncements on the subject, "the precise definition of the term 'in or affecting commerce' is not easily settled." Noel L. Allen, *North Carolina Unfair Business Practice* § 6-3, at 183 (2d ed. 2000). The statute's reach has been described as "unquestionably broad." *Id.*

---

[3] As a result of amendment in 1977, Section 75-1.1 no longer contains the word "trade." Prior to the amendment, the statute provided that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." *See* Noel L. Allen, *North Carolina Unfair Business Practice* § 6-3, at 183 (2d ed. 2000). The General Assembly removed the word "trade" in response to the Supreme Court's ruling in *State ex rel. Demister v. J.C. Penney Co.*, 292 N.C. 311, 233 S.E.2d 895 (1977), which concluded that the phrase "trade and commerce" was narrower than "commerce" alone. *See* Allen, *supra*, § 6-5, at 186–87.

The statute itself says that the term " 'commerce' includes <u>all business activities,</u> <u>however denominated</u>." N.C. Gen. Stat. § 75-1.1(b) (emphasis added). The North Carolina Supreme Court has interpreted "business activities" to mean "the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 594, 403 S.E.2d 483, 493 (1991).

{45}   Although the statute has a broad reach, the legislature and the courts have excluded a number of activities from its application. *See generally* Allen, *supra*, §§ 14–15 (describing statutory exemptions for the media, learned professionals, agricultural cooperatives, and others; and case law exemptions and exclusions for employee-employer relations, securities and other extraordinary sales, sale of a private residence, state and local government actions, and news gathering). The courts' exclusion of most employment relationships from the statute is at issue in the case at bar and warrants discussion.

{46}   Commentator Noel L. Allen observes that "[f]or most of the life span of N.C. Gen. Stat. § 75-1.1, courts have held that it did not apply to the employee-employer relationship—period." Allen, *supra*, § 15-1, at 351. Most disputes between employers and employees are internal to the business organization and simply do not have an effect on commerce in the way required by section 75-1.1. *E.g.*, *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 710 (2001) ("[T]he Act does not normally extend to run-of-the-mill employment disputes."). However, the presence of an employment relationship is not a talisman for claims brought under section 75-1.1. *Id.* There are cases in which an employment dispute affects commerce in such a way as to give rise to a Chapter 75 claim. One such case is *Sara Lee Corp. v. Carter*, 351 N.C. 27, 519 S.E.2d 308 (1999).

{47}   In *Sara Lee*, the defendant was an information technology employee in the Sara Lee Knit Products Division. *Id.* at 29, 519 S.E.2d at 309. According to the defendant's job description, he was to "develop[] and maintain[] relationships with vendors to provide [Sara Lee Knit Products] with the best possible pricing,

availability, and support of hardware and services." *Id.* Unknown to Sara Lee, "defendant developed four separate businesses through which he engaged in self-dealing by supplying Sara Lee with computer parts and services at allegedly excessive cost while concealing his interest in these businesses." *Id.* Sara Lee sued, alleging, among other things, unfair or deceptive acts or practices under Chapter 75. *Id.* at 30, 519 S.E.2d at 310. The trial court concluded that the defendant had engaged in unfair and deceptive practices, and awarded treble damages and attorney fees to Sara Lee under the provisions of Chapter 75. *Id.* at 30–31, 519 S.E.2d at 310–11. The Court of Appeals reversed the award of treble damages and attorney fees. *Id.* at 31, 519 S.E.2d at 311. The Supreme Court then reinstated the trial court's awards under Chapter 75 on the grounds that "defendant and plaintiff clearly engaged in buyer-seller relations in a business setting." *Id.* at 33, 519 S.E.2d at 312. In this way, the employment relationship in *Sara Lee* became more than an internal matter and strayed into the channels of commerce subject to the provisions of Chapter 75.

{48} *Dalton v. Camp* is a contrary example. There, plaintiff produced an employee newspaper for a furniture company. 353 N.C. at 649, 548 S.E.2d at 706. Defendant was employed by plaintiff and produced the publication. *Id.* While still in plaintiff's employ, defendant formed a competing publishing company and secured a contract to produce the furniture company's employee newspaper. *Id.* Defendant resigned shortly thereafter. *Id.* Plaintiff's complaint included claims for unfair or deceptive acts or practices under Chapter 75. *Id.* The Supreme Court found that summary judgment was proper on plaintiff's Chapter 75 claims. *Id.* at 650, 548 S.E.2d at 707. Justice Orr, writing for the court as he had in *Sara Lee*, distinguished the two cases as follows:

> Unlike the *Sara Lee* defendant, who worked as a purchasing agent, Camp did not serve his employer in the capacity of either a buyer or a seller. Nor did he serve in any alternative capacity suggesting that his employment was such that it otherwise qualified as "in or affecting commerce."

*Id.* at 658, 548 S.E.2d at 711.

{49}  In this case, the actions alleged in Plaintiffs' Complaint are not "in or affecting commerce." Plaintiffs were employed by Defendants. (Compl. ¶¶ 14, 17.) This fact alone does not preclude application of section 75-1.1. *See Dalton*, 353 N.C. at 656, 548 S.E.2d at 710. However, the dispute that arose between them remained internal to Axiom. A number of these disputes were over the amount of compensation due to Plaintiffs under the terms of their employment. Pyrtle claims he was only paid $55,304 of the $75,000 production/performance bonus promised to him by Johnson. (Compl. ¶ 33.) Schlieper similarly claims he never received the production/performance bonus due to him in 2005. (Compl. ¶ 34.) Both Plaintiffs claim to have never received a 2005 profit distribution due to them under the Letters of Understanding. (Compl. ¶ 32.) The phantom interests created in the letters of understanding were contingent upon Plaintiffs accepting employment at Axiom. (Compl. ¶¶ 18–19.) These facts allege a dispute over compensation due to employees under the terms of various documents that governed their relationship with their employer. Axiom was a reinsurance business, and the amounts paid to employees such as Schlieper and Pyrtle were not part of the "day-to-day activities" Axiom regularly engaged in and for which it was organized. *See HAJMM*, 328 N.C. at. 594, 403 S.E.2d at 493.

{50}  In their brief, Plaintiffs attempt to analogize this case to *Sara Lee*, arguing that Schlieper and Pyrtle's relationship with Axiom was a business partnership rather than mere employment. (Pls.' Brief Opp. Defs.' Mot. Dismiss 9.) *Sara Lee*, however, is distinguishable from this case in many ways. In *Sara Lee*, the defendant "engaged in self-dealing business activities wherein he sold computer parts and services to his employer from companies owned by him." 351 N.C. at 32–33, 519 S.E.2d at 311. The Supreme Court cited *United Virginia Bank v. Air-Lift Associates*, 79 N.C. App. 315, 339 S.E.2d 90 (1986), for the proposition that section 75-1.1 "applies to dealings between buyers and sellers at all levels of commerce." *Sara Lee*, 351 N.C. at 32, 519 S.E.2d at 311 (quoting *United Va. Bank*, 79 N.C. App. at 320, 339 S.E.2d at 93). The court then focused on the buyer-seller aspects of the relationship between the defendant and Sara Lee, concluding as follows:

> [W]e conclude that the transactions at issue were "in or affecting commerce" and thus fall within the scope of the Act. There is uncontradicted evidence in this case that defendant sold computer parts and services, through his various enterprises, to plaintiff. Trusting that these were legitimate transactions secured at competitive prices in the marketplace, plaintiff regularly conducted business with the companies in which defendant had an interest. In this case, defendant and plaintiff clearly engaged in <u>buyer-seller relations in a business setting</u>, and thus, we hold that defendant's fraudulent actions fall within the ambit of the statutory prohibition of unfair and deceptive acts or practices as determined by the trial court.

*Id.* at 33, 519 S.E.2d at 312 (emphasis added). The Supreme Court's focus was on the defendant's self-dealing transactions and the fact that they took place in the marketplace and outside the employment relationship. Sara Lee thought it was purchasing computer parts and services from independent companies in the open market, when in reality it was being defrauded by one of its own employees.

{51} The Complaint in this matter does not allege a buyer-seller relationship between Plaintiffs and Defendants, nor does it allege any sort of self-dealing transaction. The Supreme Court held an employee liable to his employer under Chapter 75 in *Sara Lee* because of the buyer-seller relationship between them. Once the buyer-seller relationship was established, the court disregarded the employment relationship and did not allow it to be used as a shield. *Id.* at 34, 519 S.E.2d at 312 ("[H]aving already characterized defendant's conduct as buyer-seller transactions that fall squarely within the Act's intended reach, we conclude that defendant's relationship to plaintiff as an employee, under these facts, does not preclude applicability of N.C.G.S. § 75-1.1 to this case."). The dispute here is over employment compensation in the context of a sale of a company's assets. The acts alleged did not affect commerce or the marketplace as did the defendant's actions in *Sara Lee.*

{52} Plaintiffs' argument that they were "business partners," rather than mere employees, of Axiom is contradicted by the pleadings. In the Letters of Understanding, Plaintiffs were given only a phantom stock interest. They had no equity stake in Axiom, no votes to cast, and no risk of loss. The phantom interest

was given to Schlieper and Pyrtle as an incentive to work at Axiom, but was specifically tailored to give them none of the control or influence of business partners. They were valued employees to be sure—but not business partners.

{53} This result is also in keeping with the general purpose of section 75-1.1. The statute was designed to protect consumers. *E.g.*, *Lindner v. Durham Hosiery Mills, Inc.*, 761 F.2d 162, 165 (4th Cir. 1985) ("The apparent purpose behind the enactment of § 75-1.1 was the protection of the consuming public."); *Bunting v. Perdue, Inc.*, 611 F. Supp. 682, 690 (E.D.N.C. 1985) ("[T]he more recent pronouncements from the North Carolina Supreme Court concerning the applicability of § 75-1.1 emphasize the consumer protection purpose of the statute."). The statute was not meant to apply to the internal affairs of business associations. The law is replete with mechanisms to address those types of disputes, and section 75-1.1 need not be stretched beyond its intended purpose to accommodate them.

{54} For these reasons, Defendants' Motion to Dismiss Plaintiffs' second claim for relief is granted.

### 3.

### BREACH OF CONTRACT

{55} The Complaint contains three separate claims for breach of contract. The Court will address each in turn.

### a.

### 2005 PROFIT DISTRIBUTIONS

{56} First, Plaintiffs claim "Johnson has breached the contract with Schlieper and Pyrtle by failing to pay Schlieper and Pyrtle the amount owed to each of them respectively for the 2005 year profit distribution payments." (Compl. ¶ 62.) The Letters of Understanding were the source of these profit distribution payments, granting Schlieper a 5% phantom interest in Axiom's net profits and Pyrtle a 2.5% phantom interest. (Compl. Ex. C–D.) On December 29, 2005, Schlieper and Pyrtle each signed an "Agreement to Terminate Letter of Understanding." (*See* Compl. Ex. F.; Answer Ex. 2.) Plaintiffs agreed that in consideration for cash payments,

the Letters of Understanding were "terminated and of no further legal effect" as of December 29, 2005. (Compl. Ex. F; Answer Ex. 2.) In the December 12 letters, it was made clear to Plaintiffs that the cash payments they were offered represented "the dissolution of the Phantom Stock Plan and your contributions to Axiom for the past, present, and envisioned in the future." (Compl. Ex. E.) By agreeing to terminate the Letters of Understanding, Plaintiffs gave up their interest in Axiom's profits. The Agreements to Terminate ended any obligation on the part of Axiom to pay a portion of its profits to Plaintiffs. Plaintiffs, after three weeks to consider Defendants' offer, agreed to accept cash payments as compensation for the complete and final dissolution of the Letters of Understanding. Since any obligation to pay Plaintiffs' profit distributions was dissolved by the December 29 agreements, Plaintiffs' claim for breach of contract based on failure to pay those profit distributions is dismissed.

b.

SCHLIEPER BONUS

{57}   Plaintiffs claim "Johnson has breached his contract with Schlieper by failing to pay Schlieper any of the production/performance bonus promised to Schlieper." (Compl. ¶ 64.) The allegations underlying this claim are contradicted by the documents before the Court. In a September 1, 2000 letter, Schlieper was offered an annual salary "plus a bonus to be determined." (Compl. Ex. B.) His bonus was discretionary. The letter does not mention a "production/performance bonus." Schlieper was Senior Vice President and Chief Financial Officer of Axiom. His was in a management position, rather than a sales position like Pyrtle. As such, he would not have been entitled to a "production/performance bonus." Thus, this aspect of Plaintiff's breach of contract claim is also dismissed. Any promise to pay him a bonus for 2005 after 2005 would lack consideration and Schlieper had already received a payout under the Agreement to Terminate Letter of Understanding that covered any bonus compensation for services.

c.

PYRTLE BONUS

{58}    Finally, Plaintiffs claim "Johnson has breached his contract with Pyrtle by failing to pay Pyrtle the full $75,000 owed to Pyrtle for his production/performance bonus promised in the December 29, 2005 letter to Pyrtle." (Compl. ¶ 63.) As Plaintiffs note, the December 12 letter to Pyrtle says that "[f]or the 2005 year you will receive a bonus of $75,000 in appreciation and recognition of your contribution to the success of the Company." (Compl. Ex. E.) The Complaint alleges that of this amount, Pyrtle received only $55,304. Defendants argue that the $55,304 paid to Pyrtle represented his promised bonus, less expenses and costs. Neither the December 12 letter nor any other documents before the Court indicate that costs and expenses were to be deducted from the $75,000 promised to Pyrtle. As such, Pyrtle's claim for breach of contract based on Defendants' failure to pay the full amount promised him in the December 12 letter is not subject to dismissal at this time.


IV.

CONCLUSION

{55}    Based on the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED:

1. Defendants' Motion to Dismiss Plaintiffs' claims for relief for fraud is GRANTED.

2. Defendants' Motion to Dismiss Plaintiffs' claims for relief for negligent misrepresentation is GRANTED.

3. Defendants' Motion to Dismiss Plaintiffs' claims for relief for unfair and deceptive trade practices is GRANTED.

4. Defendants' Motion to Dismiss Plaintiffs' claims for relief for breach of contract based on the 2005 profit distributions is GRANTED.

5. Defendants' Motion to Dismiss Plaintiffs' claims for relief for breach of contract based on Schlieper's bonus is GRANTED.

6. Defendants' Motion to Dismiss Plaintiffs' claims for relief for breach of contract based on Pyrtle's bonus is DENIED.

This the 31st day of August, 2007.

# Schlieper Phantom Calculation

# RS

*Phantom Calculation*

## Sales Calculation

| | |
|---|---:|
| Projected NI for Sales Calculation | 7,500,000 |
| | |
| less reduction in HMJ Salary | (615,000) |
| less Service Brokerage (85% of 2006) | (676,000) |
| less Johnson Mgmt Bonus Pool | (1,250,000) |
| less reduction in Airplane Costs | (500,000) |
| | |
| Adjusted NI for Phantom Sales Calculation | 4,459,000 |
| | |
| Multiple | 8.00 |
| | |
| **Adjusted Phantom Sales Price** | 35,672,000 |
| less approx Fixed Assets | (458,323) |
| **NET Adjusted Phantom Sale Price** | 35,213,677 |

## Payout Detail

| | |
|---|---:|
| RS Share (@ 5%) | 1,760,684 |
| less principal balance | (350,000) |
| less accrued interest | (91,867) |
| | |
| **RS Net Payout** | 1,318,817 |

*\* Based on Gross Share*

## Interest Accrual Calculation

| | | |
|---|---:|---:|
| Principal Balance (5% of $7,000,000 Base) | $ | 350,000 |
| | | |
| 2002 | 21,000 | |
| 2003 | 22,260 | |
| 2004 | 23,596 | |
| 2005 | 25,011 | |
| | | |
| Total | 91,867 | |

*\* 2002-2005 Compounded Annually @ 6%*

# Pyrtle Phantom Calculation

# WP

### Phantom Calculation

| | |
|---|---:|
| Projected NI for Sales Calculation | 7,500,000 |
| | |
| less reduction in HMJ Salary | (615,000) |
| less Service Brokerage (85% of 2006) | (678,000) |
| less Johnson Mgmt Bonus Pool | (1,250,000) |
| less reduction in Airplane Costs | (500,000) |
| | |
| Adjusted NI for Phantom Sales Calculation | 4,459,000 |
| | |
| Multiple | 8.00 |
| | |
| Adjusted Phantom Sales Price | 35,872,000 |
| less approx Fixed Assets | (458,323) |
| NET Adjusted Phantom Sale Price | 35,213,677 |

| | |
|---|---:|
| JP Share (@ 2.5%) | 880,342 |
| less principal balance | (175,000) |
| less accrued interest | (45,933) |
| | |
| JP Net Payout | 659,408 |

### Interest Accrual Calculation

| | | |
|---|---:|---:|
| Principal Balance (2.5% of $7,000,000 Base) | $ | 175,000 |
| | | |
| 2002 | 10,500 | |
| 2003 | 11,130 | |
| 2004 | 11,798 | |
| 2005 | 12,506 | |
| | | |
| Total | 45,933 | |

2002-2005 Compounded Annually @ 6%